IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| Spirit Lake Tribe, and Myra Pearson, individually, | ) ) ) |
| Plaintiffs, | ) ) **MEMORANDUM OPINION &** |
| | ) **ORDER GRANTING IN PART AND** |
| vs. | ) **DENYING IN PART MOTION FOR** |
| | ) **PRELIMINARY INJUNCTION** |
| Benson County, North Dakota; Benson County Board of Commissioners; Curtis Hvinden, David Davidson, Michael Steffan, Lowell Haagenson, and Jason Lee, in their official capacity as members of the County Board of Commissioners; and Bonnie Erickson, in her official capacity as the County Auditor for Benson County, North Dakota, | ) ) ) Civil File No. 2:10-cv-095 ) ) ) ) ) ) ) |
| Defendants. | ) |

Before the Court is a Motion for Preliminary Injunction filed by Plaintiffs (Doc. #10). Defendants have filed a brief in opposition (Doc. #26). A hearing was held in this matter on October 19, 2010. The Court, having considered all of the evidence in the record and the arguments of the parties, now issues this Memorandum Opinion and Order.

**SUMMARY OF DECISION**

Plaintiffs have met their burden of proof in establishing that: 1) they have a likelihood of success on the merits; 2) they will suffer irreparable harm if the preliminary injunction is not granted; 3) the balance of harm weighs in their favor; and 4) public interest in granting the preliminary injunction weighs in their favor. Nonetheless, the voting station located in Oberon, North Dakota is not located on the Spirit Lake Reservation and there is insufficient evidence to find that a polling place in Oberon is necessary to avoid the harm. As such, the Motion for

1

Preliminary Injunction is **GRANTED** in part **DENIED** in part.

## FACTS

On December 1, 2009, in an effort to move towards a more cost-effective mail-in voting process, the Benson County Board of Commissioners voted to close seven of eight voting places. The remaining voting place is located at the Benson County Courthouse in Minnewauken, North Dakota. Several newspaper articles were published informing Benson County citizens of the change in voting procedure (Docs. #30, 32). Benson County conducted the June, 2010 primary election in a manner consistent with the approved vote by mail plan and did not receive any complaints from either the tribal chair or its enrolled members.

On October 8, 2010, the Spirit Lake Tribe and Myra Pearson, individually, (hereafter "the Tribe") filed a complaint asserting that the defendants (hereafter "the County") have violated their rights under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973; 42 U.S.C. § 1983; the Indian Citizenship Act; and the 14th and 15th Amendments (Doc. #1). The Tribe asserts that Minnewauken is too remote for members of the Spirit Lake Tribe to get to on Election Day. The poverty rate on the Spirit Lake Reservation is higher than that in the predominately white communities located in Benson County. Dept. of Commerce, Bureau of Census, American Indian Population and Labor Force Report (2005). Many members of the tribe do not have adequate transportation to travel to Minnewauken (Docs. #14, 21-1, 21-2, 21-3, 21-4, 21-5, 22). Imogene Belgrade, the Director of the Spirit Lake Tribe Elderly Protection Program, distributed questionnaires to the elderly population located on the Spirit Lake Reservation inquiring as to whether they believe they will be able to find transportation to Minnewauken to vote on Election Day (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5). Thirty-five out

of the 76 individuals polled predicted that they would be unable to find transportation to Minnewauken, and that they would be effectively disenfranchised on Election Day.

The County asserts that there is no disenfranchisement because every identifiable household and voter has been sent an application for a mail-in ballot. The Tribe disputes that the County's efforts are effective, pointing to various members of the Tribe who report that they never received an application for a mail-in ballot (Doc. #21-1, 21-2, 21-3, 21-4, 21-5, 22). Melissa Merrick, the Domestic Violence Director for the tribe, has stated under oath that many members of the tribe are essentially transient. She further reports that many tribal members living on the reservation have no permanent home, even though they reside continuously within the voting precinct (Doc. #22). This makes it nearly impossible for these individuals to obtain a mail-in ballot (Doc. #22). In addition, at least one member of the tribe has indicated that he received an application to vote by mail but that he discarded the application because he intended to vote at a voting place on Election Day (Docs. #14). Finally, many members of the tribe do not trust that their vote will be counted under the mail-in ballot procedure (Docs. #21-1, 21-2, 21-3, 21-4, 21-5, 22).

The Tribe therefore seeks a preliminary injunction to prevent the County from closing voting places located in Fort Totten, Warwick, and Oberon (Doc. #10). Fort Totten and Warwick are located on the Spirit Lake Reservation. Oberon, while adjacent to the Reservation, is not within the current boundaries of the Spirit Lake Reservation.

## ANALYSIS

The Tribe has presented no evidence, nor has the Court found any evidence, of intentional discrimination on the part of Benson County in establishing the new voting plan.

Instead, the closing of the voting places appears to be directly related to an effort to save money. Thus, the focus of the Tribe's claim is whether the closure of the voting places will have a disparate impact on Native Americans residing on the Spirit Lake Reservation, in violation of the Voting Rights Act of 1965.

Section 1973(b) of the Voting Rights Act, in relevant part, states that it is a violation of the Voting Rights if,

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Thus, Section 2 of the Voting Rights Act, as amended, protects Native Americans from voting practices which have a disparate impact on their right to vote. 42 U.S.C. § 1973(b). Native Americans constitute a protected class of citizens as a result of a historic pattern of voting discrimination against them in Benson County, North Dakota. United States v. Benson County, N.D., Case No. 2:00-cv-30, Doc. #2 (D.N.D. 2000) ("Native American citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas, such as education, employment, and housing"); State ex rel. Tompton v. Denoyer, 72 N.W. 1014, 1019 (N.D. 1897) (holding that Benson County's refusal to establish voting places on the Spirit Lake Reservation was unlawful).

When determining whether to grant or deny a motion for a preliminary injunction, the Court must balance the four familiar Dataphase factors: 1) the likelihood of the movant's success on the merits, 2) the threat of irreparable harm to the movant in the absence of relief, 3) the balance between that harm and the harm that the relief would cause to the other litigants, and 4)

the public interest.  Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)).  A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant.  Id.

### I. Likelihood of Success

The historic pattern of discrimination suffered by members of the Spirit Lake Tribe is well-documented.  The North Dakota Supreme Court found evidence of Benson County's discrimination against the Spirit Lake Tribe in 1897.  State ex rel. Tompton, 72 N.W. at 1019.  In 2000, following a dispute over the method of electing members of the Benson County Commission, this Court approved a consent decree, which stated:

> Native American Citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas, such as education, employment, and housing.  Native American citizens in Benson County continue to bear the effects of this past discrimination, reflected in their markedly lower socioeconomic status compared to the white population.  These factors hinder Native Americans' present-day ability to participate effectively in the political process

United States v. Benson County, N.D., Case No. 2:00-cv-30, Doc. #2 (D.N.D. 2000).  This pervasive discrimination is alleged by the Tribe to be a significant factor contributing to the entrenched problems of poverty, alcoholism, illiteracy, and homelessness.

The Tribe has provided evidence that the closure of the voting places on the reservation will have a disparate impact on members of the Spirit Lake Tribe because a significant percentage of the population will be unable to get to the voting places in Minnewauken to vote.  According to a survey conducted by Immogene Belgrade, 46% of those polled said they would be unable to find transportation to Minnewauken and thus would be unable to vote in person on

Election Day (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5).  A number of factors contribute to this problem: (1) road closures due to construction and flooding around Devils Lake; (2) the lack of reliable vehicles; (3) the lack of sufficient buses to transport voters to Minnewauken; (4) a lack of sufficient funds to pay for transportation; and (5) the sheer distance between the more remote areas of the reservation and Minnewauken (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5, 22).

The County asserts that no right to vote in person has ever been recognized under the Constitution.  American Civil Liberties Union of New Mexico v. Santillanes, 506 F.Supp.2d 598 (D.N.M. 2007) (reversed on other grounds); Indiana Democratic Party v. Rokita, 458 F.Supp.2d 775, 813 (S.D. Ind. 2006).  Additionally, the County asserts that the mail-in procedure actually solves the transportation problems and will increase voter participation.  While such an argument is tenable in communities with stable housing arrangements, poverty and transience on the Reservation makes mail balloting more difficult for tribal members (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5, 22).  The evidence suggests that Native American are more likely to have not received a ballot application, which when coupled with a decreased ability to vote in person, creates a disparate impact (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5, 22).

It is important to note that Plaintiffs are not required to establish a mathematical probability of success on the merits.  Heartland Academy Community Church v. Waddle, 335 F.3d 684, 690 (8th Cir. 2003).  Instead, the law requires the Tribe to establish a fair chance of success on the merits.  Phelps-Roger v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008).  Without reaching an ultimate decision on the merits of the case, the Court finds that Plaintiffs have submitted enough evidence for this factor to weigh in their favor.

## II. Irreparable Harm

A preliminary injunction is an extraordinary remedy with the burden of proving that it is appropriate on the movant. Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). The purpose of a preliminary injunction is to avoid irreparable harm in cases where remedies at law are ordinarily inadequate to make a party whole for the loss suffered. Geleco Corp. v. Coniston Partners, 811 F.2d 515, 520 (8th Cir. 1987). In the run of the mill case, money damages are usually adequate to protect a party's interest. Id. The right to vote is not something that can ordinarily be replaced by any amount of money. In fact, the right to vote and to have one's vote counted "is of the most fundamental significance under our constitutional structure." Illinois Board of Election v. Socialist Workers Party, 440 U.S. 173, 184 (1979). An official action that has a disparate impact on the right to vote of a protected class under the Voting Rights Act, needs to be closely scrutinized as there is simply no remedy at law for such harm other than an injunction.

In this case, a number of tribal members have asserted that if Benson County's voting plan is allowed to go forward, it will be nearly impossible for them to vote as they have neither received a ballot application nor do they have adequate means to get to Minnewauken to vote (Docs. #21, 21-1, 21-2, 21-3, 21-4, 21-5, 22). The Spirit Lake Tribe is faced with entrenched problems in the areas of unemployment, poverty, educational attainment and household stability. In 2005, 57% of Spirit Lake Tribal Members reported being unemployed. Dept. of Commerce, Bureau of Census, American Indian Population and Labor Force Report (2005). Approximately 80% of those employed still remain below the poverty level. Dept. of Commerce, Bureau of Census, American Indian Population and Labor Force Report (2005). According to the 2000

Census Report, approximately 27% of Spirit Lake Tribal Members did not graduate from high school.  Dept. of Commerce, Bureau of Census, American Indian and Alaska Native (AIAN) Data and Links, Fact Finder, (2000), Selected Social Characteristics (Table DP-2), online at http://factfinder.census.gov/home/aian/sf_aian.html.  In short, the Spirit Lake Nation faces staggering problems in areas including economics, education, housing, and employment.  The population is highly vulnerable.

      This economic and social environment creates a greater risk that Native American votes will not be counted in a primarily mail-in election system.  The population of Spirit Lake is more transient than the rest of Benson County (Doc. #22).  Approximately 52.5% of tribal members moved houses between 1995 and 2000, only 25.9% of which actually moved to a different county.  Id.  This dramatically increases the risk that larger numbers of tribal members never received a ballot application (Docs. #21-1, 21-2, 21-3, 21-4, 21-5, 22).  The population is more economically and educationally challenged than the rest of Benson County, greatly increasing the risk that Tribal members did not read the newspaper articles that described voting changes, and thus, did not fully appreciate the significance of the ballot application when it did arrive.  Given the shortness of the time to the election at this point, this problem can not be easily remedied.  Finally, voting by mail imposes at least minimal additional formalities on the voting process, a burden that would fall inordinately on the poorly educated.

      In short, there are burdens that fall on the voting process on the Spirit Lake Reservation that simply do not exist elsewhere in Benson County.  Thus, a system that might be entirely appropriate for the County as a whole, could well create a significant burden on voting within the confines of the Spirit Lake Reservation.

While a mere suspicion that the votes of the protected class are less likely to count is not sufficient, it appears to the Court that the evidence presented raises the specter that without any ill-will or improper animus on the part of the County or its election officials, there is a much greater risk that the Native American population of Benson County will be disenfranchised by the adoption of the voting plan when compared to the dominant population's risk.

Once a citizen is deprived of his right of suffrage in an election there is usually no way to remedy the wrong. There is no process for ordering "re-votes" in Congressional or legislative elections. Once an election is over, it is over and it is little consolation to say that the problem will be remedied in the next election. It is worthy of note that Congress has approached this right of suffrage question with an abundance of caution as well, given the fact that it provides protection in cases where there is no discriminatory purpose but a disparate impact on the protected class. Under these circumstances the risk of irreparable harm is real and this factor militates in favor of the position advocated by the Tribe.

### III.   Balance of Harms

The County asserts that the additional cost of opening the disputed voting places is approximately $12,000.00. While $12,000.00 is undoubtedly a significant sum of money for Benson County, the potential harm that would be suffered by Plaintiffs if they were deprived of their Constitutional right to vote outweighs any monetary harm which would fall upon Benson County. More importantly, the Tribe has offered to provide poll workers and funding to off-set the costs of keeping the disputed voting places open. Under these circumstances, the harm that would potentially be suffered by Plaintiffs far outweighs the administrative costs which will be suffered by Benson County.

### IV.     Public Interest

It is undisputed that a concern for the public fisc is a primary duty of every public servant or county board.  However, there simply is no more essential duty of a democratic government than to provide open, fair elections that are accessible to all eligible voters.  <u>Illinois Board of Election</u>, 440 U.S. at 184.  In a representative republic, the right of the people to elect their representative is superior to concerns over the public purse.  This factor weighs in favor of the Tribe.

## DECISION

While the Tribe has made contrary assertions, there is a complete paucity of evidence of overt discrimination in this case.  Rather, the decision of the County to close the disputed voting places appears to be the result of a carefully calculated analysis of how to best preserve the resources available in Benson County.  While a trial on the merits is the only method of fully determining the disparate impact, if any, Native Americans would suffer as a result of the closing disputed voting places, the unfortunate reality is that Election Day is less than two weeks away and the Court does not have the luxury of conducting a trial on the merits at this late hour.  Under these circumstances the decision of the Court is plain: the County must accommodate the voting concerns of the Tribe.

A balancing of the <u>Dataphase</u> factors would militate in favor of opening voting places in Fort Totten and Warwick, North Dakota.  The voting station in Oberon is off the Spirit Lake Reservation and it appears that travel from there is less difficult.  The Court sees little reason to treat the Oberon voting place differently than the other four voting places not located on the reservation which have been closed.

Based on the foregoing, Plaintiff's Motion for a Preliminary Injunction is **GRANTED IN PART AND DENIED IN PART**.

The Court hereby ORDERS as follows:

1) The voting place located in Fort Totten, North Dakota shall remain open to the public and shall be run in the same manner as the 2008 election.

2) The voting place located in Warwick, North Dakota shall remain open to the public and shall be run in the same manner as the 2008 election.

3) This Order has no effect on the County's decision to close the other voting places located in Benson County, North Dakota

**IT IS SO ORDERED**.

Dated this 21st day of October, 2010

*/s/ Ralph R. Erickson*
_____
Ralph R. Erickson, Chief District Judge
United States District Court